I'll now call the case of CityPlace Retail v. Wells Fargo. I'll now call the case of CityPlace Retail v. Wells Fargo. Good morning, Your Honor. May it please the Court, I am David Barrett representing the appellant, CityPlace Retail. Your Honor, the district court's decision in this case rests on a fundamental legal error in applying New York law. Under New York law, the doctrine of disproportionate forfeiture, which the district court applied here, to allow Wells Fargo to submit an untimely appraisal in connection with determining the value of this property, the doctrine of disproportionate forfeiture does not apply to express material conditions to a contract, particularly where, as here, the consequences of the party's non-performance are expressly spelled out in the contract. Counsel, before we get to disproportionate forfeiture, I have two areas of questions I want to ask you about that I think are even more fundamental or back up there. The first is a jurisdictional one, and it's the issue we carried with the case. While we have not explicitly said that where, as you go down the layers of a party and there's more LLCs, you have to dig to find out where the actual person is under all the LLCs at the end of the day, or the corporate entity, two of our sister circuits in similar situations have. What they have said is, at some point, you have to get to somebody to determine whether there is diversity. You can't just say, well, the first layer is, here are two more LLCs, and we promise you that their members are from three states that are different from the folks on the other side. Why should we not have that rule, and if we should have that rule, why should we not at least send this case to the district court just for the district court to make some findings to us about who the actual, again, once you get to peel the layer of the onion, who the Your Honor, I think there is sufficient evidence in the record to support the existence of diversity. I don't think, I know it's irrelevant, but I don't think either party contests that there is diversity. We have an independent obligation to look at that. What happened, as I understand it, is at one point, your client said, we're going to provide you with a corporate chart to set all this out, and then at some point, came back and said, well, no, here, take our word for it. By the way, we forgot a state. We forgot New Hampshire, which who can forget it? How under those circumstances are we not required to dig a little further and not just take your word for it? I think, Your Honor, because it was under oath, it is not contested, but certainly, if the court wanted to remand to the district court, that information can be disclosed. I think, honestly, I think there is some sensitivity because of the way some of these real estate limited partnerships are set up to going, digging too deeply, but that, I can assure you that that digging was done before those affidavits were submitted, and there is complete diversity. It's made a little easier by the fact that Wells Fargo, even though it's the third largest bank in the United States, seems to be a citizen of South Dakota, speaking of small states, and I think you can be pretty sure that nobody in the real estate business on the East Coast is a South Dakota resident. I appreciate your answer. Thank you. Okay, so my second line of inquiry is this. I know you want to talk about the disproportion of forfeiture, and let me assume for the moment that that may be error, but I want to back up a little bit. As I understand it, what you are trying to, your client is trying to seek here is the invocation of section 4.9G sub 5, or it's sub 4, sub 4. You're trying to invoke, that's what we're here about, right? We have an appraisal. You promised that if you didn't appoint someone, ours would be conclusive and binding, right? That's what we're here about. Okay. That provision is an if provision. In other words, it's conditional. Correct. And that condition, as I understand it, is if the other side doesn't appoint its appraiser within the time prescribed, then conclusive binding. Do we agree? Yes. Okay. So in my mind, the critical finding isn't about disproportionate forfeiture. The critical finding seems to be, based on what you want to appeal about, is the appointment finding, right? Did they appoint someone at the time that the notice was filed, or not, within the 10 days that they're allowed, or not? Do you agree with me? Yes. Okay. So let's go to that finding. Tell me why that finding from the district court is clearly erroneous, because you agree with me the district court made the finding that Mr. Lieberman was appointed within the 10 days. Well, I think the finding was that Mr. Lieberman was appointed for all purposes in August of 2018. I think that was the finding. And first of all, I don't think, it's not necessarily a clearly erroneous issue, because it involves the interpretation of the contract language, which is a question of law, and then the application of that interpretation to the facts in the case. So it's a mixed question, and it's actually a de novo. Well, the mix would be the interpretation of what appoint means. The fact of was that person actually appointed would ultimately be the fact finding. But does appoint not mean select, determine? It means engage, certainly. Well, I know that's what you say it means, but we generally read both statutes and contracts where they use two different words to mean two different things, right? Well, I think it depends on the context, but often that's the case. But, Your Honor, let me point out a number of both contractual points and factual points. If you could focus on the fact, I really want to know why that finding is wrong, because that finding seems to be the fulcrum of whether you get the relief that you're trying to see. Sure. Your Honor, the first reason that it's wrong is that the contract says in subparagraph little I, little one, within 10 business days after lender's receipt of borrower's written notice of an intended refinance. So the word after in the contract has to have some meaning. The notice was delivered on September 10th. Although they received it on September 7th, but yes. Well, we can talk about that if you really think it's material. I don't. I don't. Okay. It was completed on September 10th. Something which occurred according to the district court in August cannot possibly be, no action can be taken, cannot possibly be 10 days after something that occurred in September. So the first question, the first point is, as a matter of contract interpretation, the finding that there was an appointment in August is impossible, it makes no sense. The court doesn't allow it. Didn't the court find that at the time that the notice was received that the appointment had been made? Isn't that the finding? Well, it had to have been made previously, and she talks about why it was made, and it was made in August. I want to go back. Wasn't the finding of the district court that at the time the notice was received, the appointment had been made? Is that not the finding? I guess, yes, in terms of just the dates. So isn't that supported by the record, and I'm specifically talking about docket entry 2017, pages 34 and 35. This is Ms. Alvalo's testimony. I apologize if I'm mispronouncing it. Ms. Alvalo is asked, quote, when the notice of intent, first of all, do you recall receiving it? She says, yes, I do. And then she's asked, and once that came in, had you formed a decision or made a decision who the appraiser would be in connection with the refinance? Answer, at that point, Mr. Lieberman was already engaged and working. Question, and what was your intention with respect to Mr. Lieberman as to the additional work? Answer, he would provide an update for the purpose of the refinance, the update being on the appraising for the TIF, the T-I-F bond. Right. Right. Well, a couple of points there, Your Honor. First of all, contract law is objective. It's not subjective. The requirements are you communicate those facts to the other side. The fact that somebody at Wells Fargo had something in their head that, yes, it would make sense to use the same appraiser that we used for the TIF appraisal for this appraisal doesn't make it an appointment. Those terms have legal meaning. But here's the issue, and I don't disagree with you. But there's two sentences in that subsection one that you read. One is appointment within 10 days, and the other is notify. Yes. So those are two separate things. So one has to be I appoint you, and the other is I notify the other person of that appointment. The triggering clause, subsection four, is only triggered to appointment, not notification. So why is that not testimony in support of the finding of the district court that the Well, in the first place, I think you have to interpret the entire procedure as a whole. But secondly, the FERIA regulations, which the parties agree govern this appraisal because it involves a federal banking matter, say that an institution, and I'm reading from page 933 of the record, an institution should use written engagement letters when ordering appraisals, particularly for large, complex, or out-of-area commercial real estate properties. Just what we have here. And here an engagement letter was signed in November, correct? Signed November 1st, and your honor, the engagement letter that was signed in August was solely and very explicitly for the TIF appraisal. In addition, your honor, you recall that on October 9th, pursuant to the terms of section 4.9, CityPlace gave notice to Wells Fargo that you have failed to appoint an appraiser, which clearly was referring to these provisions. And rather than, you know, sort of acting immediately or saying, uh-oh, what happens? What happens is there is a discussion over the remaining weeks of October between Wells Fargo or Berkadia, the servicer, and the note holders who were directing the actions of the trustee under the bond indenture. The note holders were furious because Lieberman's TIF appraisal was for $114 million, which was way below the $132 million they needed in order to receive a payment at the closing. They were furious. In fact, there's evidence in the record that I believe on October 25th, they had a phone call where the note holders, you know, chewed out Lieberman, and how could you do this? This is ridiculous. And there is testimony that during that period in October, Berkadia, Wells Fargo was not even sure that they were going to use Lieberman because there was this big problem with the note holders. So it's not like, you know, somebody forgot certainly to sign the contract. It is actually a situation where they don't know if they're going to appoint this guy because of the problems they're having with the note holders. So I think under those circumstances, and given the regulation that requires the written engagement, it's clear that nothing related, remember, the engagement has to be or the appointment has to be for this appraisal, not for some other appraisal like the TIF appraisal. Counsel, I'm sorry to interrupt, but I want to make sure before you sit down that I address one other issue with you. I'm also concerned about a different jurisdictional issue, and that is that, you know, I understand Cardin v. Arcoma Associates, which is a Supreme Court case, to have explained that whether trustees can sue and be sued in their own names depends on whether the real party is in interest, including as a matter of state law. And under Navarro Savings Association, the court has explained or suggested that if the trust's beneficiaries or shareholders have a voice in the decisions of the trust and control of its affairs, including in the disposition of litigation, then they're the real parties of the trust for diversity purposes. And so here it seems like the beneficiaries are the note holders. And so, first of all, let me ask you whether you agree with that or not. And if you do, don't we need to know the citizenship of the note holders here? Your Honor, thank you for raising that issue. I'm not aware it's ever been raised previously. But as you know, since it's a jurisdictional issue, we have an obligation. Only explaining my ignorance, Your Honor. You probably would have liked to have heard this earlier somewhere along this process, as probably would the district judge. But I think I can respond to it in this sense. The structure here for this whole bond issuance financing is absolutely typical in the world of these structured finance transactions. And I don't think, based on what I heard Your Honor read in terms of the control of the note holders, I don't think, and I would be shocked, actually, if the distinguished bond counsel, who no doubt drafted these instruments, allowed it to happen that the note holders had sufficient control in the meaning of those decisions to prevent the trustee from acting as the plaintiff appropriately under diversity jurisdiction. In my experience, these cases are invariably brought in the name of the trustee. Whatever review rights, let's call it, the underlying principles the investors may have. I mean, the investors almost always have the power, for example, to remove the trustee under some set of circumstances or some high percentage of investors agree. So does that give control? I don't think so. But at the end of the day, if the trustee really wasn't doing what the investors wanted, they could remove the trustee. And I don't think, I haven't researched it, so I can't tell you that it's never been held. But I would be shocked, based on what I know about how these cases operate, that that circumstance would be held to be controlled such that we would have to go back and look at the citizenship of all of the investors. And in fact, I think it's even more complicated. There are certain note holders who may have some rights in this regard. There are others who may not. So do we look at all of them? Do we look at only the ones that have certain rights? What rights do we look at? I mean, I guess if we don't want the federal courts to hear these cases in diversity, that might be a way to discourage it. But up to now, it has certainly been the understanding in the industry, to my knowledge, that they can be brought. Thank you. Thank you very much. I may proceed, Your Honors. You may. Peter Havlis, you're on behalf of the Wells Fargo as trustee, or the CMBS trust, that is the real party in interest here. Let me speak quickly to both jurisdictional issues that Your Honors have raised. First about your issue, Judge Rosenbaum. This is a CMBS trust. It's an indivisible trust. The trustee has sole authority, which is delegated to the servicer. Contrary to what Mr. Barrett has said, the note holders do not have any decision making here. In fact, Ms. Alvelo testified that the note holders had no say in what was going on and that they were being consulted for a client relations purpose to keep them in the loop. But it was a decision to be made solely by Brocadia in its capacity as the servicer, appointed as the servicer by the trustee under the pooling and servicing agreement. The note holders only have limited authority under the pooling and servicing agreement. Specifically, if they want to do something, then they need 25% of the note holders and they have to give a demand to the trustee and they have to proceed. There is no issue here that this was a note holder decision. And Mr. Barrett just doesn't have support in the testimony. The note holders wanted to have control. They were pounding the table, but Brocadia was consistent in its testimony at trial, as well as in its communications to the note holders that this was Brocadia's decision alone. Ms. Alvelo also testified, to just close the loop on that, that she began having discussions with Mr. Lieberman about this project in early October, once the other appraisal was finished and they were beginning the update. She wasn't dithering, as was suggested by the mischaracterization of the record about her testimony and the limited testimony that was allowed by the district court from the note holders, much of which was excluded as hearsay. Your questions, Judge Sulek, about jurisdiction, you are right. There was a promise for a chart. We had asked for a chart. We were told it was too complicated and they wanted to do just an affidavit. We have no reason to believe that there are any entities in the related chain of companies that are from the state of South Dakota, as fine state as that is, because it's one of the leading banking states. A number of bank companies have either incorporated in Delaware or South Dakota because of the statutes they've done. We don't have a reason to believe it either, but we'll say. I agree with Your Honor. If you want clarity, then a remand solely on this issue is an appropriate issue. And the only thing that raised my antenna a little bit is that there was an error initially. Originally it was said there was only two or three states, and then as this sort of progressed, the affidavit came and said, wait a minute, there actually is another state. And it's complicated enough that it seems that we do have an obligation to assure ourselves of it. I cannot disagree with Your Honor because I specifically pounded the table for a chart and was told one wouldn't be put forward and there was just going to be the affidavit. So I have no reason to doubt the veracity of the affidavit based on my dealings with related and other contexts as a commercial litigator in New York City where related is one of the behemoths, making the former president's family look small in terms of real estate developers in New York. But if the court needs clarity, then a remand solely for findings on that would not be inappropriate. Judge Locke, I think you really zeroed in on what was going on here. So let me talk about a couple of things that were said. Let me first correct what Mr. Barrett said about FREA. Subparagraph G of 4.9 merely says the appraisal has to comply with FREA. Wells Fargo in its capacity as a trustee, as the party stipulated, and as the City Places expert admitted at trial, that Wells Fargo did not make a loan here as a banking institution. So the full panoply of FREA does not apply here. The only question is, is only the portion of the regulations that talk about the content or substance of an appraisal have been incorporated by the contract, even though the CMBS trust is not a bank? So this idea that there must have been an engagement letter because FREA requires a bank to have an engagement letter is a false one. It's just a straw man argument because there was no obligation for an engagement letter because the trust is not a banking institution making a loan. Mercadia testified that it was not its practice to do engagement letters generally. They would do it for administrative purposes. They do it belatedly. They don't really care about it other than the document, the record about what the fee is. But moving on now to the more important point about the August date and Ms. Alvelo's testimony. Your Honor is right. That is what Ms. Alvelo testified about, that by early September they had made the decision that they would continue with Mr. Lieberman. But even assuming arguendo that it was in August, this is kind of an odd situation. This is not the loan is going to mature in 2021 and they decide a few years early to refinance. The loan had to be paid off on December 11th, come hell or high water. And this refinancing, this notice was all in context with the mandatory repayment that had to occur. So there is testimony in the record with Ms. Corallo that she began having discussions with CityPlace in June about the refinance and the need to have to pay off the loan on December 11th. Counsel, that really is all well and good, but it seems to me that your opposing counsel is right that you can't hire someone for, at least under this contract, you can't hire someone or appoint someone until the notice is filed. Well, Your Honor, I think under contract law, it would beg the question of, I say, I know the notice is going to come because it's mandatory because of the December 11th date and I appoint them a week early. I mean, CityPlace appointed Mr. Wallace three weeks before they sent their notice because they called him on August 22 before the September 7th letter saying, will you do this? So I think from a contract interpretation, if I appointed two days early to say that that constituted a breach or was ineffective, would not be a practical solution. But even assuming that's the case, Ms. Avella's testimony is very clear that after receipt of the notice, they made the decision that Mr. Lieberman would continue to be the person. And Your Honor is right that there is a distinction because they used the word appoint and engage. And appoint means select. There's not much dispute about what that word means from a legal or common usage, as we pointed out in our brief. And with respect to engage, then you have to do the engagement letter. Now, oddly, there's no timing about when the engagement is supposed to occur in that paragraph. I'm not sure that's 100% true because while it doesn't say when the engagement has to happen, it does say you have to notify when, quote, so engaged. Yes. Well, no, I actually just have to notify about the appointment. Look at the second sentence and I have it up here in front of me, Your Honor. Sub one. Yes. We'll look at it together. How about that? I'm going to turn to page 16 of the agreement, Your Honor, because I brought it up here with me. It says, each party shall notify the other of the identity of the appraiser so engaged. Yes. So that person has to, is that an indication that the person has to have been so engaged? Ambiguous, Your Honor, as to whether the party has to be engaged. I don't know that that's ambiguous. You said engage means hired under an engagement letter. Engaged does mean, yes. Engage means hired. And certainly, they made the decision to appoint. And as Your Honor said in subparagraph four of 4.9G, it's the absence of appointment that triggers the delusion. And I guess that's what I come down to, because it does seem like there is some strong evidence that your clients violated at least some portions of this contract. For sure. They screwed up on the notice issue, Your Honor. They admitted that to the court. We admitted that in our answer. There has never been an attempt to hide from that fact. And I guess the question is simply remedy, which is that remedy they're seeking is the one under sub four. And as I, in the questions I was asking with your opposing counsel, that seems to only be triggered by that first sentence of subsection one, not the second sentence of subsection one. That is correct. It's the absence of appointment and nothing more. And indeed, if you go through the agreement, when you deal with other types of situations where notice or information is supposed to be provided, they're very particular about the types of remedies that could be done. For instance, they talk about an estoppel certificate on the ground lease that had to be done in 2012 in section 4.15. Or not 4.15, I'm sorry. I'll give you the section in a second. But it makes the point that if you fail to do that, then it's an event of default. So the contract was very specific in defining remedies for different types of actions. And here, the only thing that provided the forfeiture of the right to participate in the appraisal process was the absence of an appointment, not the notice. As Judge Rosenberg said in her findings, as well as when she was pulling through questions in the last hour before trial recess, when it was just effectively a quasi-closing argument, CityPlace is unable to identify anything that was dependent upon the notice element of it in terms of its timing and how it worked in the chain. The notice doesn't work at all in the chronology. It's the appointment process. I don't think that's 100% true. They did identify something that's important. I don't know that it's part of their claim, because their claim seems to be triggered on subsection 4, but what they identified is that if the appraisal had been done pursuant to the time frame, that they wouldn't have considered the change in zoning. Now, I know that's a disputed issue, and you may want to address that, but it's not fair to say that they didn't identify some of the issues. And the issue there was that there was, as Judge Rosenberg found, I've got to be careful. You're not the first. It's okay. I know. I know. In the first department, there's a very, just on the first department in New York and so forth, they have very similar names, so I've done the same trip, Your Honor. But with respect to the timing of the appraisal, that issue is not based on the notice issue. That issue is based on the failure to cooperate that Judge Rosenberg found about CityPlace not providing information, and the last piece of information, the financial information that the appraiser needed not coming until the second week in November. Well, does that even, can I ask you something? Does it even matter if, Judge, the district court, I'll say the district court, because that's easier for me. Sure. The district court found here, based on the expert testimony, that an appraiser under the USPAP and with the minimum guidelines of FERA would have, in fact, considered the change in zoning, whether that was after November 5th or before November 5th. Well, sure, because it's a different question. Before it's November 5th saying what is the impact of the proposed change on current market prices, after November 5th it is what is the impact of the adopted amendment. So it's a subtle distinction with not a lot of significance for USPAP. So I guess my question is, what does the breach of cooperation, the duty of cooperation, whether it happened or not, matter? Because whoever did the appraisal, whenever they did the appraising at that time within, between September and December, would have had to consider the zoning change. If the injury is that they wouldn't have had to consider the zoning changes, Your Honor, posited in the hypothetical, you're absolutely right. The timing of it doesn't matter because there was an obligation, as even their expert conceded, under questioning by both the district court and myself, that you had to look at the current impact of information that was known, i.e., the zoning. So as a result, yes, if the only injury that comes from the delay in the, in the notice is that they, it postpones the appraisal and they get to consider the zoning, that's, that's a false assertion, as Your Honor points out. I do want to say one thing before, a couple of things quickly about disproportionate forfeiture and the other issue about the, the notice, and that's on materiality. I wanted to apologize to the court because in my brief, I, we said that there was no New York law on the issue of materiality here as time of the essence, and I was wrong when I said that. Indeed, urban archeology, one of the decisions cited by CityPlace in this brief, written by Justice Mazzarelli, who had a very distinguished 20-year career in the appellate division, specifically said in a case involving time of the essence, you still had to look at materiality. And I'll quote read you what she wrote. She said, in light of the rule, we examine the issue presented here, whether the IAS court, the trial court in New York, could alter the provisions of the partnership agreement, which laid out a procedure for a buyout with an express 90-day limitation on its exercise by repeating granting extensions of that time period. In determining the importance of delayed performance under the terms of a contract, various factors are to be considered on a case-by-case basis and include the nature and object of the contract, the previous conduct of the parties, the presence or absence of a period of faith, the experience of the parties, and the possibility of prejudice or hardship to either one, as well as the specific number of days provided for performance. While the parties can assure a finding that is time of the essence by including those or equivalent words within the agreement, specification of a particular time frame within the language of the contract by itself is not determinative of whether a delay would constitute a material breach of the agreement. And Justice Mazzarelli cited to an earlier decision by the appellate division Burgess Steele, which also made the point that when you're dealing with time of the essence clauses, you have to look at the materiality before deciding, particularly here where you have a blanket clause, which just applies willy-nilly to every day whether there was a material breach. Now, the whole point about disproportionate forfeiture is that the notice is not that one way or another, and that materiality in that context is an issue of fact, not an issue of law, because the contract interpretation is do you have to find its material? Yes. The factual determination is whether it was material, and New York courts have routinely said that materiality of a particular term is a factual issue that has to be decided by the jury or the trier of fact. Likewise, the New York jurisprudence treatise that they cite makes that same point two sentences after the block quote they had in their city place had in its brief, that it's a materiality issue in all respects. So I apologize to the court to not pointing those things out in my brief in the first instance. But since the notice term is not a material, the delay in notice, and if there was a, if we say it had to be a written notice, the delay of the written notice was only 10 days. That written delay of the notice was not going to prevent or interfere with a closing on which was admitted by counsel during the argument that the court had at the close of evidence. I've used up my time, and I thank the court for its patience, and we submit the rest on our papers. Thank you. Your Honor, just a few points. As a matter of New York law, no injury is required. If the term is material, if there's a breach, that's it. That's the end of the discussion. The time is of the essence clause uses language that has a standard accepted meaning under New York law, and no matter where it appears in the contract, and we can cite you a bunch of cases if that's really an issue, no matter where it appears in the contract, it applies, unless it's clearly in a section where it only applies to that section. If it appears somewhere else in the contract, it applies to all dates in the contract. They are all material. So it's not just a question of the notice. It's a question of the appointment, and it's a question of completing the appraisal within 30 days. They were required to complete the appraisal by October 24th. Lieberman wasn't engaged until November 1st. The questions where the district court found that CityPlace didn't respond promptly, i.e. it was two days late on a provision that said reasonable efforts to provide the information in five days, so it was a different provision. It was reasonable efforts. It wasn't an absolute five-day cutoff. In any event, all of that happened in November. Lieberman was already weeks late at that point. The point that I made earlier, I think, is really critical. Contract law depends on objective manifestation by the parties to the contract, and there's perhaps no better example of that, and it's really highly relevant here than a case that we cited in our reply brief on pages four and five called In Re Reese, R-I-E-S-E, also in the appellate division. In that case, the Brooklyn Museum, a major cultural institution in New York, lost the opportunity to obtain an extraordinarily rare and valuable West African sculpture that was to be given to the museum. The terms were they had to return the signed deed of gift within 30 days of receiving it. Now, not only did the museum's trustees vote to accept the gift within two weeks, and an officer of the museum actually signed the deed document, but then what happened was for two weeks over the Christmas, New Year's holiday, somehow those documents got lost in the internal mail system at the museum, and ultimately the donor didn't receive them until five days after the 30-day period had expired. On the facts, it's about as sympathetic a set of facts with respect to materiality, five days, with respect to the effect on the public interest. This sculpture had been shown regularly in the museum for 10 years as an important part of its collection, and what does the appellate division say? It says, it is undisputed that respondent failed to deliver the acceptance within the 30 days of the deed. Contrary to respondent's contentions, no circumstances warranting equitable intervention are present here, and we cited in our brief the excellent brief that was filed by the Mrs. Hubbard law firm, they're in New York, they're in Miami, on behalf of the museum, where they set out a really compelling story. I was a little shocked by this decision when I understood what was behind it. A compelling story of why the court should exercise its equity powers, find the delay immaterial, or otherwise excuse it, and they said, no, we can't do that. This is a rule of law that is extremely important to the policy of the state of New York, and it is a rule, respectfully, that I think needs to be enforced in this case, notwithstanding what a judge, even a trial judge, hearing all the evidence, may believe is the equitable thing to do. Thank you very much. Thank you. We appreciate the presentations. Very helpful. And we have the